**MINNESOTA CIVIL LIBERTIES UNION, a Minnesota non-profit Corporation, Randall Tigue, Robert Lee Johnson and Edward Clark, Plaintiffs,**

v.

**Kenneth SCHOEN, Individually and as Commissioner of Corrections for the State of Minnesota, and Frank Wood, Individually and as Warden of the Minnesota State Prison, Defendants.**

No. 3–75–411.

United States District Court,
D. Minnesota,
Third Division.

Dec. 29, 1977.

As Modified and On Order for
Judgment April 25, 1978.

Karl L. Cambronne, Minneapolis, Minn., for plaintiffs.

Fred S. Suhler, Jr., Sp. Asst. Atty. Gen., St. Paul, Minn., for defendants.

## MEMORANDUM OF DECISION AND ORDER

BENSON, Chief Judge, Sitting by Designation.

This action was brought under 28 U.S.C. §§ 1343(3), 2201, 2202, and 42 U.S.C. § 1983.

Deprivation of rights secured by the First, Sixth and Fourteenth Amendments to the Constitution of the United States is alleged; specifically, Plaintiffs challenge prison mail regulations[1] at the Minnesota State Prison on the basis of free speech and right to effective assistance of counsel grounds. In their prayer for relief, Plaintiffs seek to have the mail regulations declared unconstitutional insofar as they allow review and censorship of communications by and between inmates of the prison and attorneys working for the Minnesota Civil Liberties Union (MCLU) and their assistants.[2] They further seek a declaration that the acts of Defendants complained of, the review and censorship of prison mail, are in violation of the First, Sixth and Fourteenth Amendments, and request appropriate injunctive relief.[3]

The action was tried to the court, and taken under advisement on the filing of post trial briefs.

## I. PARTIES TO THE ACTION.

### A. *Plaintiffs.*

The Minnesota Civil Liberties Union is an incorporated, non-profit corporation, organized under the laws of the State of Minnesota. The stated objective of this association is the preservation and protection of individual liberties guaranteed to all citizens under the Constitution of the United States and the Constitution of the State of Minnesota. To this end, the MCLU provides legal services and assistance to various individuals through practicing attorneys who are either employed by the association or who volunteer their time, and other personnel of the association who assist these attorneys in the roles of investigators or para legals, or who provide clerical assistance.

Randall Tigue is a Minneapolis, Minnesota attorney who was employed by the MCLU at the time this action was commenced. Since that time he has resigned his MCLU post to enter private practice, but continues to act as counsel for the MCLU on a voluntary basis. In that capacity he has occasion to provide legal counsel and representation to persons whose complaints are directed to the association. Among such persons in the past have been inmates confined to the custody of the Commissioner of Corrections, State of Minnesota, at the Minnesota State Prison.

Plaintiffs Robert Lee Johnson and Edward Richard Clark are presently lawfully confined for the commission of crimes to the custody of the Commissioner of Corrections, State of Minnesota, at the Minnesota State Prison, and are subject to the mail regulations in effect at the prison. They have in the past had occasion to communicate by mail or otherwise, with persons in the MCLU relating to their own legal matters.

### B. *Defendants.*

Kenneth Schoen is the duly appointed and acting Commissioner of Corrections of the State of Minnesota. In that capacity he is responsible for the management and control of State of Minnesota correctional institutions, including the Minnesota State Prison. M.S.A. § 243.40.

Frank Wood is the duly appointed and acting Warden of the Minnesota State Prison.[4] In his capacity as Warden (chief executive officer of the prison), Wood is responsible for the management of the Minnesota State Prison, including the regulation of communication through the mails by inmates, within guidelines set forth by the

1. Plaintiffs initially challenged "regulations governing communications to and from inmates . . . ," including regulations governing receipt or recorded communications. The challenge was narrowed at a pretrial conference, directed solely at Defendant's written regulations governing the sending and receipt of "mail."

2. Plaintiffs seek to have this court declare that communications between inmates and the

MCLU are "privileged and protected by the 6th Amendment to the United States Constitution."

3. Plaintiffs' request that a three-judge court be convened pursuant to 28 U.S.C. §§ 2281, 2284 was abandoned at a pretrial conference.

4. Defendant Wood is the successor to Bruce McManus, who was warden at the time the action was commenced. *See* F.R.Civ.P., Rule 25(d)(1).

Commissioner of Corrections and the laws of the State of Minnesota.

## II. BACKGROUND, REGULATIONS CURRENTLY IN EFFECT.

The Minnesota State Prison is a maximum security correctional institution used for the confinement of adult males who have been convicted of felonies.[5] The population of the prison has been steadily increasing in recent years, and is currently approximately 1,000 inmates. The physical plant of the institution, which was constructed near the turn of the century, may be considered obsolete by present standards. The institution.has large open cellhalls and other design features which make the maintenance of security and order difficult when inmates are allowed, as they normally are, to move about within the institution.

In the past five years, there have been numerous murders and assaults at the institution. This violence has been directed by inmates against members of the staff of the prison as well as against other inmates. Much of this violence has been attributed to the presence of contraband drugs within the institution. In addition to crimes of violence, inmates have also been involved in crimes of forgery, extortion and activities which involve defrauding magazine publishers. Finally, there is the ever-present possibility that inmates confined at the institution will attempt to escape and be successful in their efforts.[6]

The inmate mail regulations currently in effect at the prison, which are in question in this action, are as follows:

2. *Censorship of Mail:* As a general practice, incoming and outgoing mail will not be censored. However, the executive officer of each institution reserves the right to spot censor mail when he determines such censorship is necessary for the security and well-being of the institution.

3. *Inspection of Mail:* All incoming and outgoing letters with the exception of those listed in Number 4 below will be opened to check for contraband items.

4. *Sealed Letters:* There shall be no inspection or censorship of incoming or outgoing mail between an inmate and the following:

| | |
|---|---|
| Commissioner of Corrections | Attorneys |
| Deputy Commissioner of Corrections | Ombudsman |
| | Pardon Board |
| Minnesota Corrections Board | State Claims |
| Elected Officials | Commission |

When a question arises as to the authenticity of the mail described above, the mail clerk shall refer the unopened letter to the institution's executive officer for authorization to transmit.

5. *Acceptance of Money:* Mail containing cash, stamps or personal checks shall not be accepted. Letters containing the above shall be returned to the sender with the appropriate notification of the regulations. Bank drafts, postal money orders, cashier's checks or Treasury checks will be accepted but they must be made payable to the Warden with a notation that the money is for a specific inmate.

These regulations were promulgated pursuant to Minnesota statutes,[7] and have been in effect since at least October of 1972.

All mail which comes into the institution goes to the mailroom, and there it is handled by two staff persons who have basically clerical jobs within the institution, the mail inspector and the mail clerk. Incoming mail is first sorted into three categories by the mail clerk: staff mail, inmate mail subject to inspection and inmate mail not subject to inspection, referred to as "legal mail." Correspondence is determined to be "legal mail" by reference to the return address.

5. One prison official described the type of inmate confined at the prison as "distilled"— meaning that more likely than not, an inmate at the prison has been convicted of other crimes prior to the conviction which resulted in his present confinement.

6. Testimony at trial indicated that within the past year, four inmates succeeded in breaking out of the institution, although all four were recaptured.

7. *See* M.S.A. §§ 243.40, 609.105.

Mail which is to be inspected [8] is opened by the mail clerk. The opened mail (mostly letters) is given to the mail inspector, who removes the contents of each envelope to determine the presence of any contraband.[9] At that time the content of the letter may be "scanned" or read by the mail inspector.[10] A record is kept of all contraband items enclosed in an envelope, which items are either disposed of or returned to the sender. When the inspection process has been completed (assuming no contraband is present), the contents of the envelope are replaced, the inmate cell number affixed, and the envelope re-sealed by means of a staple. "Legal mail," not subject to this type of inspection, is not opened in the mailroom; however, the unopened envelopes are visually inspected for any indication of contraband.[11] All mail is eventually brought into the secure area of the institution where it is first distributed in bulk to the individual cellhalls, and then delivered individually to the inmates' cells.

From time to time, when the staff members regularly assigned to the mail room are ill or on vacation, other clerical personnel assume the mailroom inspection duties. On these occasions in the past, and possibly when new mail room personnel have begun working, mistakes have been made, and mail which is not supposed to have been opened and inspected has been so opened and inspected.

Outgoing mail is processed through the mailroom before it leaves the institution. "Legal mail" may be sealed by the inmate, and is not subject to being opened or inspected (except for visual inspection of the envelope). Non-legal mail may not be sealed by the inmate. It is subject to inspection in the same manner as incoming mail of a non-legal character. Although it does not appear that as much attention is paid to the written content of the outgoing letters,[12] outgoing non-legal mail is subject to inspection, principally to prevent certain items from being sent out of the institution.[13]

On occasions in the past, mail addressed to inmate plaintiffs Johnson and Clark from the MCLU has been opened intentionally by prison staff persons under current regulations.

## III. THE MCLU ISSUE.

The status of the Sixth and First Amendments issue in this case involving the MCLU is clouded at this time. Defendants concede that at least for a certain period of time in the past, mail to and from the MCLU was treated as non-legal mail, subject to the attendant opening and inspection

8. The number of pieces of incoming inmate mail inspected on an average day is approximately 500–600.

9. The mail inspector testified that a least 2 or 3 letters to inmates are received each day with cash enclosed, in violation of Regulation Number 5, set forth previously. Prison officials testified that money, whether it be cash, checks or other negotiable instruments, in the hands of inmates at the prison can create substantial security risks, affecting internal order and rehabilitation of prisoners. Not only does it facilitate illicit transactions between inmates, it also provides inmates with a means of corrupting staff members.

10. The letter may be read to determine the presence of "written contraband." In the context of incoming mail, "written contraband" might include escape plans, threats made to individual inmates or instructions on how to make explosives. Prison officials testifying at trial could recall no instances where a written escape plan was discovered in prisoner mail.

11. With reference to "legal mail," a record is kept of the identity of the correspondents and the date of receipt.

12. A prison official did testify that on at least one occasion it was necessary to read an inmate's outgoing mail for content, in order to determine the presence of "written contraband." The incident involved an inmate who had been mailing "shocking" letters to an older woman, who complained to law enforcement officials, who in turn contacted officials at the prison. The inmate was informed that he was not to engage in such activity, and his outgoing mail was monitored for a week to insure that no "shocking" letters were being sent out by him. (It is not clear whether all of the inmate's outgoing mail was read, or only that mail addressed to the particular woman who complained.)

13. These "items" would include money and documents printed in the prison print shop such as phony business cards, auto titles, etc.

of that type of mail. Since commencement of the present action, however, MCLU mail to and from inmates is not being opened and has apparently been shifted into the "legal mail" classification.

## IV. PLAINTIFFS' CENSORSHIP CHALLENGE—*Procunier v. Martinez.*

■ The appropriate standard for review, grounded in the First Amendment's freedom of speech, for the mail regulations at issue is set forth in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), a case involving a censorship challenge to mail regulations at a California state correctional institution.

[W]e hold that censorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad. This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more of the legitimate governmental interests identified above.

*Id.* at 413, 414, 94 S.Ct. at 1811 (footnote omitted).[14] The burden lies with Defendants to show that censorship resulting from the operation of prison mail regulations is warranted. *Thibodeaux v. State of South Dakota,* 553 F.2d 558, 559–60 (8th Cir. 1977); *Carpenter v. State of South Dakota,* 536 F.2d 759, 762 (8th Cir. 1976), *cert. denied,* 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977).

■ Initially, it is necessary to an understanding of Plaintiffs' challenge to define certain terms relevant to the meaning of the prison mail regulations at issue. "Inspection" involves in part a searching for physical contraband, with interception of that contraband the goal.[15] "Inspection" can also involve reading, or perusal of the *content* of written correspondence, to determine the presence of "written contraband."[16] Censorship, or "'interference with . . . intended communication,'"[17] can be direct or indirect. In the context of prison mail regulations, direct censorship can be the excising of certain portions of written correspondence, or the withholding of delivery of a piece of mail. Indirect censorship is a "chilling" of the content of written correspondence; it involves a reluctance on the part of the communicating parties to in-

14. The Supreme Court's holding in *Procunier v. Martinez* turned not on prisoner rights specifically, but on First Amendment rights generally, in the context of "incidental restrictions on First Amendment liberties imposed [on non-prisoner correspondents] in furtherance of legitimate governmental activities." 416 U.S. at 409, 94 S.Ct. at 1809.

15. The inference can be drawn that knowledge, on the part of inmates and their correspon-

dents, that inmate mail is inspected for physical contraband has a definite effect on the amount of physical contraband seized from inmate mail.

16. *See* Notes 10, 12.

17. *Taylor v. Sterrett,* 532 F.2d 462, 469 (5th Cir. 1976), *quoting Procunier v. Martinez,* 416 U.S. at 408–09.

clude certain communication in written correspondence because of the knowledge that such written correspondence may be read by other parties.[18]

## V. FINDINGS OF FACT, CONCLUSIONS OF LAW, RATIONALE.

The court has jurisdiction over the cause of action and the parties to the action.

▆ The inmate mail regulations currently in effect at the Minnesota State Prison, set out previously, allow prison officials to inspect and censor (as these terms are defined herein) all non-legal inmate mail going into or coming out of the institution.

The purposes of the inmate mail regulations are: (1) to insure that the mails are not utilized to introduce physical contraband into the institution; (2) to insure that the mails are not utilized as a means of sending physical contraband out of the institution; and (3) to prohibit the sending out, or receipt of, correspondence the content of which is harmful to the security or order of the institution or harmful to persons residing either within or without the institution ("written contraband").

The identifiable governmental interests at stake in the inmate mail regulations at this maximum security institution are the preservation of internal order, the maintenance of institutional security and the rehabilitation of the inmates. Each of these substantial governmental interests is unrelated to the suppression of expression. The mail regulations in issue further all of these interests.

The breadth or scope of prison officials' authority in this case to inspect and censor inmate non-legal mail is not repugnant to the standard of *Procunier v. Martinez*.[19]

However, because of certain deficiencies in the regulations, and because of uncertainties in procedures utilized in administering the regulations at the Minnesota State Prison[20] due to the deficient regulations, the "sweep" of the restriction on inmate correspondence is unnecessarily broad. *Procunier v. Martinez*, 416 U.S. at 414, 94 S.Ct. 1800. Certain changes in the inmate mail regulations are required, as well as the establishment of certain procedures at the institution to insure the regulations are utilized properly, in order to comply with the *Procunier v. Martinez* standard.

▆ First, with respect to the mail regulations, Defendants should define in detail what is to be considered written contraband. Not only will this provide notice to staff members whose job it is to inspect and censor inmate non-legal mail, but it will also provide notice to inmates as to what can and what cannot be sent through the mails. In addition, provision should be made in the regulations for minimal procedural safeguards to be utilized when a decision is made to censor a portion of or withhold delivery of a particular letter. *Procunier v. Martinez*, 416 U.S. at 417–419, 94 S.Ct. 1800.[21] With respect to Plaintiffs' Sixth Amendment claims, the question on the status of MCLU mail is moot, except that the regulations should be changed to reflect the present handling of MCLU mail. Lastly, in order to minimize the "chilling" effect of inmate mail regulations and practices on prisoner correspondence, the number of persons handling inmate mail should be limited, and Defendants should specify in the regulations the procedures which are utilized in the handling of such mail, both incoming and outgoing, designating by posi-

---

**18.** *See Procunier v. Martinez*, 416 U.S. at 423–27, 94 S.Ct. 1800 (Marshall, J., concurring); *Taylor v. Sterrett*, 532 F.2d at 469.

**19.** The evidence presented at trial by Defendants established the need for this type of inspection and censorship of inmate non-legal mail at the Minnesota State Prison. Defendants therefore met the burden imposed on them in *Carpenter v. State of South Dakota*, 536 F.2d at 762. *See also Thibodeaux v. State of South Dakota*, 553 F.2d at 559–60.

**20.** The *Procunier v. Martinez* standard is applicable to a "regulation *or practice*" which inhibits the exercise of the First Amendment's freedom of expression, in the context of regulating inmate mail. *Procunier v. Martinez*, 416 U.S. at 413–14, 94 S.Ct. 1800 (emphasis added).

**21.** For guidance in making the required changes in inmate mail regulations, see *Procunier v. Martinez*, 416 U.S. at 412–419 and n.14, 15, 94 S.Ct. 1800.

tion the staff members who handle it, and listing any other designated group involved in the mail distribution and collection schemes.

Defendants are ORDERED to draft proposed revised regulations incorporating changes and additions as outlined above. The proposed regulations are to be submitted to the court not later than March 1, 1978. Plaintiffs shall have until March 24, 1978, to submit any response they deem appropriate.

Under the circumstances in this case, there is no necessity for the granting of any injunctive relief at this time on any of Plaintiffs' claims.

## ON ORDER FOR JUDGMENT

In a Memorandum of Decision and Order entered December 29, 1977, Defendants in this action were ordered to draft and submit to the court proposed revised inmate mail regulations for the Minnesota State Prison, incorporating changes and additions as outlined in the court's order. The proposed revised regulations, with comments and suggestions from counsel for the parties, are now before the court.

■ Attached as an appendix to this order is Mail Regulation 5–101.4. The correspondence provisions in the Regulation are in compliance with the December 29, 1977 order of this court, and with the standards set forth in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).[1]

■ IT IS ORDERED that Mail Regulation 5–101.4 be incorporated in and made a part of Minnesota State Prison Policy Manual, and that through some appropriate means the inmates of the institution be advised of the provisions in the Regulation.[2]

IT IS FURTHER ORDERED that judgment be entered for dismissal of the action with costs to the Plaintiffs.

## APPENDIX

5–101.4 MAIL

A. There shall be no restriction on the number of persons with whom an inmate may correspond. The Warden has the right to inspect mail when he determines such inspection is necessary for the security and well-being of the institution. All incoming and outgoing letters with the exception of those in the categories listed below ("Privileged Mail") will be opened by a member of the Mail Room Staff and checked for contraband items.

All mail that is not privileged communication will be opened and subject to inspection.

1. *Privileged Mail:* There shall be no opening for inspection of inmate mail sent to or received from the following correspondents.

| | |
|---|---|
| Commissioner of Corrections | Attorneys |
| Executive Assistant Commissioner of Corrections | Ombudsman for Corrections |
| Minnesota Corrections Board | Pardon Board |
| Appointed/Elected Officials | State Claims Commission |
| Minnesota Civil Liberties Union | |

However, all privileged mail which, after visual inspection, reveals it may contain contraband will be opened in the presence of the inmate involved and staff witnesses.

2. Only correspondence in the above privileged categories may be sealed by inmates when sending mail out of the institution. Any other outgoing letters which are sealed by inmates will be returned to the inmate involved, with the notification: "You

---

1. The Regulation has been designated 5–101.4 at the suggestion of Defendants. Those provisions of the Regulation dealing with periodicals and published materials relate to issues not presented to the court and are outside the scope of this court's December 29, 1977 order, but were included by defendants in their proposed Regulation as part of their comprehensive mail policy.

Though included in 5–101.4 they remain outside the scope of this Order of the court as well as the order of December 29, 1977.

2. Defendants have indicated to the court by letter that the inmates will be advised of the institution's change in policy through publication in The Mirror, the institution's inmate newspaper. This would be an "appropriate means."

have sealed this letter in violation of institution mail regulations."

3. On all outgoing correspondence an inmate shall use his cell number and institution number, and should encourage his correspondents to use the same.

4. Bank drafts, postal money orders, cashier's checks, or U.S. Treasury checks will be accepted. However, they must be made payable to the Warden with a notation as to the inmate for whom the money is intended. Cash, stamps, personal checks or money instruments of the types listed which are not in proper form, will be returned to the sender, along with a written and signed notice stating that receipt of same by an inmate is not allowed.

5. Incoming mail may contain greeting cards, correspondence, and pictures which are not pornographic. When incoming mail contains any items except for the above, such items will be returned to the sender with the appropriate notification of regulations.

6. When a book or magazine is received from a private party and not from the publisher, the inmate involved will be contacted and instructed to notify one of his visitors to pick the item up to be taken out of the institution within 30 days, or the inmate will be given the opportunity to have the Mail Room Staff mail the item out at the inmate's expense.

B. *Criteria for Disapproval of Inmate Mail* —Content: In addition to visual inspection of mail, random reading of the mail may be done. In the course of that random reading, the following will apply:

1. *Outgoing Letters:* Outgoing letters may be disapproved for mailing only if the content falls as a whole or in significant part into any of the following categories:

    a. The letter contains threats of physical harm against any person or threats of criminal activity.

    b. The letter threatens blackmail or extortion.

    c. The letter concerns sending contraband into or out of the institution.

    d. The letter concerns plans to escape.

    e. The letter concerns plans for activities in violation of institutional rules.

    f. The letter concerns plans for criminal activity.

    g. The letter is in code and its contents are not understood by the staff reader.

    h. The letter solicits gifts of goods or money from other than family.

    i. The letter is obscene.

    j. The letter contains information which if communicated would create a clear and present danger of violence and physical harm to a human being. In addition, an outgoing letter may be disapproved for mailing if the person to whom the letter is addressed (or a parent or guardian, if such person is a minor or incompetent) has filed a written request with the Warden that he/she does not wish to receive mail from the inmate involved. This rule shall not be construed to prevent an inmate from corresponding with his children if his parental rights have not been terminated.

2. *Incoming Letters:* Incoming letters may be disapproved for receipt only if they fall into the foregoing categories (Subsection B.1., "a" through "j"), or if the letter contains material which would cause severe psychiatric or emotional disturbance to the inmate.

3. *Limitations:* Disapproval of a letter on the basis that it would cause severe psychiatric or emotional disturbance to the inmate may be done only by a member of the institution's psychological or psychiatric staff after a consultation with the inmate's caseworker. The staff member may disapprove the letter upon a finding that receipt of the letter would be likely to affect prison discipline or security or the inmate's rehabilitation, and that

there is no reasonable alternative means of ameliorating the disturbance of the inmate.

4. *Notice of Disapproval of Inmate Mail*

    a. When an inmate is *prohibited from sending a letter,* the letter and a written and signed notice stating one of the authorized reasons for disapproval and indicating the portion or portions of the letter causing disapproval will be given the inmate.

    b. When an inmate is *prohibited from receiving a letter,* the letter and a written and signed notice stating one of the authorized reasons for disapproval and indicating the portion or portions of the letter causing disapproval will be given the sender. The inmate will be given notice, in writing, that a letter has been rejected, indicating the authorized reasons and the sender's name.

    c. Material from correspondence which violates any of the provisions of Subsection B.1. "a" through "j", above, may be placed in an inmate's file. Other material from correspondence which is observed in inspection and random reading of inmate correspondence may not be placed in an inmate's file. An inmate shall be notified in writing of the placing in his file of any material from correspondence, which is observed in inspection and random reading of inmate mail.

5. *Appeals:* If an inmate wishes to appeal the application of this policy he may do so by filing a written appeal with the Censorship Review Board within five (5) days of a notice he has received.

C. *Periodicals and Published Material:* As a general rule, periodicals and published materials mailed to inmates directly from the publisher will not be censored.

*Subscriptions:* Each inmate will be allowed three (3) subscriptions at any one time. These subscriptions must be ordered through the Commissary and paid for in advance.

*Canteen Sales:* The Canteen will have six (6) periodicals available for purchase. The six will be selected by the inmates through a survey conducted through the Prison Mirror. The survey will be made once each year during the month of March. The six periodicals receiving the most votes will be available for purchase.

*Information Desk:* Periodicals and published material will not be received over the Information Desk.

*Exclusions:* Periodicals and published materials will not be allowed to be purchased by subscription or in the Canteen if they deal with any of the following:

    a. manufacturing of explosives;

    b. manufacturing of fire arms;

    c. manufacturing of drugs and/or drug paraphernalia.

At any time an individual copy of a periodical or published material which comes in by subscription or from Canteen Sales contains any of the above, it will not be allowed in. In the event this does happen, the periodical or published material will be returned to the publisher with the reason for exclusion, and the inmate(s) will be given written notice of the exclusion.

*Appeals:* If an inmate feels that an exclusion action is inappropriate he may appeal the action to the Censorship Review Board. Appeals must be in writing, and made within five (5) days of the notice of exclusion.

D. *Censorship Review Board:* The Minnesota State Prison shall have a Censorship Review Board which shall be the sole authority for the resolution of disputes as to whether or not an inmate's mail or periodicals and published materials should be censored or excluded.

1. *Members:* The Warden shall appoint a Censorship Review Board consisting of not less than three members, none of whom will have any responsibility or control over normal handling of the mail or periodicals or published materials for inmates. The Warden may designate alternate members to serve in the absence of a regular

member. A Chairman, appointed by the Warden, shall preside over the Censorship Review Board.

2. *Operation:* The Board will meet upon request of the Chairman, the Warden, or an inmate who appeals any application of this policy resulting in disapproval of any of the inmate's mail. If the Board refuses a hearing to an inmate who has taken an appeal it must set forth, in writing, the reasons for such refusal. The inmate involved may appeal the hearing refusal to the Warden. The Warden or his designee will review the issues on which a hearing was requested and may order the Board to give the inmate a hearing, or the Warden may take such other action as he may deem to be appropriate.

Hearings will be convened upon the call of the Chairman at such time and place as he may designate. Each party to a dispute will be notified of the time and place of the hearing and will be given an opportunity to be heard. The Chairman may request others to appear and present such materials as he deems appropriate. At the conclusion of the hearing, the Board will deliberate in private and reach a conclusion by majority vote. The Board will confine its activities to the determination of the following issues:

1. Does the correspondence meet any of the criteria for disapproval of inmate mail?

2. Does the periodical or published material meet any of the criteria for exclusion from subscriptions for inmates or Canteen sales?

In each case where either of the foregoing questions is answered in the affirmative, supporting reasoning must be given for the decision. The written findings and conclusions shall be binding, and shall be delivered to each party to the dispute.

E. Mail Delivery Schedule:

Outgoing: 7:30 a.m. – Delivered to Mail Room by Cell Hall Staff.

Incoming: 2:30 p.m. – Picked up by each Cell Hall Officer-In-Charge or his designee.

F. *Distribution of Incoming Inmate Mail:* Distribution of inmate mail will be as follows:

1. The Mail Room Staff will sort the mail by cell hall and cell number.
2. The 3rd Watch O.I.C. from each living unit will pick up the mail Monday through Friday at 2:30 p. m.
3. Designated officers in each unit will sort the unit mail and deliver it to the individual inmates during the 3:30 p. m. count.
4. In the event that an inmate is not in the cell indicated on a letter or periodical or published material, the designated officer will:

a. deliver such mail to the new cell of the inmate involved if it is within the same unit; or

b. deliver the mail to the O.I.C. of the unit where the inmate has moved; or

c. return the mail to the Mail Room if the inmate has been transferred out of the institution; or

d. retain the mail of those on Off Count, and deliver it at the 10:00 p. m. count, if the individual inmate does not pick it up from the designated officer beforehand.

5. Inmates will not be involved in the distribution of incoming mail.

G. *Envelopes:* All envelopes used for outgoing mail will be purchased through the Canteen.

H. *Legal Correspondence:* When correspondence is notarized by an institution notary, the notary may hand carry the notarized correspondence directly to the Mail Room Staff.

I. *Greeting Cards:* There will be no homemade greeting cards received or sent out. They will be returned to the sender.

J.  *Parcel Post:* No package will be allowed to enter the institution through the U.S. Mail. Any packages will be returned to sender, unopened. If no return address is on a package, the inmate will be contacted to: 1) submit the return address to the Mail Room Staff; or 2) instruct one of his visitors to pick the package up to be taken out of the institution.

K.  *Special Postal Regulations:*

1.  *Certified:* Sender has proof of delivery.

    Fee: In addition to postage, cost is 60¢. A return receipt (fee 25¢) may be requested, which indicates to whom a letter was delivered and when. In this case both the sender and the post office have a record of delivery.

2.  *Registered:* Can be used when sending anything of monetary value, i. e., money, bonds, jewelry, watches. The most protective and secure manner to send such items.

    Fee: Minimum $2.10 (in addition to postage).
    Maximum $100.00 (in addition to postage).
    The fee depends on value of the item sent.
    A return receipt may be requested.

3.  *Special Delivery:* Handled by the United States Mail Service more rapidly than regular mail.

    Fee: $1.25 in addition to postage.
    To have mail delivered in any of these categories, it must be so indicated on the envelope.

L.  *Postage for Inmates:* On outgoing mail, if the postage is more than the amount paid when the envelope was purchased at the Canteen, the inmate is charged the additional postage in the special postage charge record.

M.  *Manuscripts:* Manuscripts are mailed at Book Rate, if postage would be over 30¢ if the manuscript were mailed First Class. The Book Rate is 30¢ for the first pound, 11¢ for each additional pound through seven (7) pounds, and 8¢ for each additional pound over seven pounds. SPECIAL 4th CLASS MANUSCRIPT RATE is to be marked clearly on the envelope. The inmate will be charged the outgoing postage in the special postage charge record. A 13¢ reduction per small envelope will be allowed, since 13¢ postage on each envelope is paid when the envelope is purchased at the Canteen. *Return Postage on Manuscripts:* Inside the envelope containing the manuscript will be a second envelope, which is to be enclosed for the return of the manuscript. The inmate must pay for the return postage on the second envelope, either at the time the envelope is purchased at the Canteen or when the manuscript is mailed out of the institution.

N.  *Postage Due:* On incoming inmate mail which requires additional postage, a Special Postage Charge slip will be filled out and sent to Inmate Accounts and to the inmate involved as notification that the inmate will have the amount due deducted from his account.