**In re George I. BENNY and Alexandra Benny, husband and wife, Debtors.**

**Bankruptcy No. 3–82–00973–LK.**

United States District Court,
N.D. California.

April 14, 1983.

Richard M. Grant, Krause, Timan, Baskin, Shell & Grant, Larkspur, Cal., Kevin F. Bernie, San Francisco, Cal., for debtors George & Alexandra Benny.

Vernon D. Stokes, Stokes & Welch, San Francisco, Cal., for trustee John England.

PECKHAM, Chief Judge.

## I. BACKGROUND

George I. Benny is currently under indictment on charges of mail fraud, in violation of 18 U.S.C. § 1341, and racketeering, in violation of 18 U.S.C. § 1962(c). Mr. Benny's estate is presently subject to a Chapter 7 proceeding in bankruptcy court. The criminal action was proceeding to trial on April 14 when, in early March, Mr. Benny discovered that the trustee in bankruptcy, Mr. John England, had caused Mr. Benny's mail to be rerouted from his business and residence addresses to the office of the trustee since mid-February, without providing Mr. Benny either notice or opportunity to object. This mail redirection, once discovered, occasioned a motion by Mr. Benny for myriad relief in the criminal action, i.e., for dismissal of the indictment, a continuance of the trial date, protective orders concerning the mail redirection and an evidentiary hearing in which evidence of the existence and impact of the mail redirection would be presented.

This court conducted such an evidentiary hearing on March 15, 1983, to investigate the extent of the mail redirection and its possible effect upon Mr. Benny's ability to defend himself in the criminal action. From affidavits submitted in advance of, and after, the hearing and from testimony elicited at the hearing itself, the following emerged:[1]

In mid-February, Mr. England filed three requests for change of address with the United States Postal Service; those notices requested that the mail of Mr. George I. Benny and Mrs. Alexandra Benny be rerouted from 115 Red Rock way, San Francisco (Mr. Benny's business address), 2135 Ralston Avenue, Hillsborough (the Benny's residence) and The River Inn, 9400 W. 4th St., Reno, Nevada, to the trustee's office at 55 New Montgomery Street, # 626, San Francisco.[2] Mr. England testified that he submitted, along with the change of address card, a copy of an order from the bankruptcy court approving his bond.[3] He did not obtain an order from the bankruptcy court specifically approving the mail redirection nor did he provide Mr. Benny with notice and an opportunity to object to the redirection prior to its commencement.

At a creditors' meeting in bankruptcy court on March 4, over two weeks after the redirection had begun, Mr. England delivered to Richard Grant, Mr. Benny's bankruptcy attorney, a cardboard box containing 150 letters which had been redirected pursuant to the trustee's request. Mr. Grant's declaration indicates that Mr. England stated that, as trustee in the pending bankruptcy proceeding, he had the right to operate the business of Mr. Benny and, accordingly, had the right to receive any mail addressed to that business. Ted Cassman, co-counsel for Mr. Benny in the criminal action, examined this mail and determined that it contained:

1) three letters from Richard Jaeger (Mr. Benny's trial counsel) to Mr. Benny concerning the progress of the criminal pro-

---

1. Mr. Benny was present with his counsel in the criminal proceeding, the trustee was present with his counsel, and the government was represented by one of the Assistant United States Attorneys in charge of the criminal prosecution. Mr. Benny, the trustee and the government each submitted briefs.

2. No evidence was adduced concerning the date of the River Inn redirection. Mr. Benny did present evidence that letters addressed to him at 38th Avenue, San Francisco, had also been received by the trustee. No one was able to explain the trustee's receipt of the letters,

and the trustee denied having filed a request for the 38th Avenue address.

3. On March 18, 1983, Lester Yee, Acting Manager of the Diamond Heights Station, wrote to Mr. England to inform him that the Post Office had received neither the written authorization of Mr. Benny nor copies of court documents authorizing Mr. England as Mr. Benny's agent and therefore would not redirect Mr. Benny's mail until such authorization was received. He did not mention the prior redirection.

ceedings. Each was addressed to Mr. Benny at his home and not to Red Rock Way;

2) several letters from Joseph Eisenberg, a Los Angeles attorney who represents Mr. Benny in the bankruptcy proceedings;

3) several responses from creditors and other interested parties to Mr. Benny's overtures concerning the possibility of settling their claims against him and having his affairs taken out of bankruptcy;

4) at least five letters from other attorneys who represent Mr. Benny in other civil matters;

5) approximately 30 to 40 notices of delinquency and of default on various loans, mortgages, utility bills, telephone bills, and credit cards;

6) many personal letters addressed not only to Mr. Benny, but also to his wife, Alexandra, his daughter and his son.

Thus, although the redirection requests purportedly related only to Mr. and Mrs. Benny, mail addressed to Mr. Benny's daughter and son was also intercepted.[4] Mary Ann Benny and George I. Benny, Jr., are not debtors in the bankruptcy proceedings. Many of these documents were submitted in evidence during the hearing.[5]

Mr. England's secretary testified that she routinely opened all mail that was delivered to the trustee's office, scanned it to ascertain its nature,[6] discarded the envelopes, and placed it on the trustee's desk. She customarily signed for certified mail which required a signature and a return receipt. Mr. England denied having read any communications between Mr. Benny and his attorneys, with the exception of one letter from Mr. Eisenberg, formerly Mr. Benny's bankruptcy attorney, in which he stated his reasons for withdrawing as attorney in the bankruptcy proceedings. The testimony was conflicting concerning Mr. England's awareness that he was receiving Mr. Benny's personal, as well as business, mail.

On the basis of the foregoing evidence, Mr. Benny proffered two arguments in support of the requested relief. First, he contended that the mail redirection had substantially frustrated his communication with his attorneys in the criminal action and thus had hindered his ability to answer the charges against him. The mail redirection, he averred, significantly delayed the transmission of important information and documents and created an atmosphere of mutual distrust, which damaged the attorney-client relationship.

Second, Mr. Benny suggested that privileged information may have been transmitted to the government by indirect routes. Testimony at the hearing established that Mr. Stokes, counsel for the trustee, had, pursuant to statute, 11 U.S.C. § 704(6), conveyed information pertaining to Mr. Benny's estate to Chicago Title Insurance Company, purportedly Mr. Benny's most substantial creditor. Mr. Benny further alleged that Chicago Title in large part precipitated, and assisted in, the criminal proceeding and, hence, that privileged information flowing from Mr. England and Mr. Stokes to Chicago Title had been provided to the government. However, toward the conclusion of the hearing, United States Postal Inspector David Smith testified that *he,* alerted by an article in the San Francisco Examiner, had initiated the investigation of Mr. Benny and had contacted the United States Attorney's office, which resulted in the instant prosecution.

Following the hearing, Mr. Benny filed a supplemental memorandum, reiterating his requests for a trial continuance, and requesting further that the court remove the

4. The yellow redirection postal label carries only the name "Benny."

5. Mr. Benny, through his counsel, introduced the documents only for the purpose of identifying the sender, the intended recipient, the date and, when possible, the address to which they were sent. He did not waive any applicable privilege in regard to the content of the letters.

6. The testimony is somewhat unclear on this issue. At one point, Mr. England's secretary asserted that she never read the mail but later conceded that she glanced at it briefly and on occasion made copies of certain documents.

present trustee, appoint a new trustee, stay the bankruptcy proceedings,[7] enjoin further diversion of mail and reserve the issue of possible dismissal of the indictment.

On March 24, this court granted Mr. Benny's motion for a two-month trial continuance[8] and, by separate order, temporarily restrained the trustee from continuing to divert the mail of George I. and Alexandra Benny from any address but that of 115 Red Rock Way.[9] Mr. Benny was required to notify his attorneys to direct their correspondence to another address and to deliver to the trustee all business-related mail not addressed to him from his attorneys. The court did not rule on the motion to dismiss but noted that the present record did not support Mr. Benny's claim that he had suffered irreparable prejudice[10] in his efforts to prepare a defense nor his theory that information relevant to the criminal proceeding had flowed from the trustee to Mr. Stokes, from Mr. Stokes to Chicago Title and from Chicago Title to the government or that either Mr. Stokes or Mr. England had directly communicated such information to the government. During a hearing on March 25, the court denied the Mr. Benny's motion to dismiss without prejudice to his right to seek dismissal in the futuree future should further evidence come to light.[11]

7. He further requested this court to transfer the bankruptcy proceedings to another division and to set aside all orders of the bankruptcy court rendered since January 15.

8. This court granted the continuance primarily on the basis of Mr. Jaeger's representations that he had not had sufficient time to prepare Mr. Benny's defense in this complex action. This situation was aggravated, not created or precipitated, by the mail redirection.

9. The order enjoined the trustee from redirecting *all* the mail of Mary Ann Benny and George I. Benny, Jr., from *any* address whatsoever. The language of the order may have created some uncertainty as to this point. Although Mr. England was not a party to the criminal proceeding, he subjected himself to the jurisdiction of the court by appearing at the hearing; he testified and was represented by counsel therein.

Subsequently, Mr. Benny, through his counsel in the bankruptcy action, moved this court, pursuant to General Order Number 24, to withdraw the entire bankruptcy proceeding from the bankruptcy court, to remove the trustee and to vacate the order of Bankruptcy Judge King requiring the Bennys to remove themselves from their Ralston Avenue residence. On April 5, this court conducted a hearing on the above motions. After considering the arguments and evidence adduced therein, we concluded that the record did not support Mr. Benny's contentions concerning the pervasiveness of the alleged "taint" resulting from the mail redirection. The trustee did, admittedly, act improperly in reading the previously-described letter from Mr. Eisenberg. However, this act of malfeasance was not sufficiently egregious to justify this court in removing a trustee who has performed competently and to the satisfaction of all creditors since he was appointed, nor has that act demonstrably affected the integrity of the bankruptcy proceeding. Aside from this transgression, Mr. England, in redirecting the mail, has merely followed a practice which has been uniformly utilized by trustees for decades. We impute no pernicious motive to the trustee in his adhering to this practice; rather, we wish to address the merits of the practice itself, both generally, and in the specific context of this case.

*See Matter of Warden of Wisconsin State Prison,* 541 F.2d 177 (7th Cir.1976). Moreover, this court has the authority, in the exercise of its inherent equitable powers, temporarily to restrain a nonparty in order to preserve the integrity of the criminal proceeding before it. *See United States v. United Mine Workers of America,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *United States v. Hall,* 472 F.2d 261 (5th Cir.1972).

10. Whatever prejudice Mr. Benny has suffered has surely been cured by the two-month trial continuance.

11. During the March 15 hearing, this court refused to act on Mr. Benny's requests relating to the bankruptcy proceeding, such as his request that the trustee be removed. Since many other parties in interest were involved in the bankruptcy proceeding, this court concluded that said motions should be filed in that context, rather than in that of the criminal action.

Therefore, although we otherwise deny the present motions for relief in the bankruptcy proceedings, *see* Order of April 5, we have determined to withdraw from those proceedings the limited issue of the extent of the trustee's power to redirect mail. While the issue was originally raised in the criminal proceeding, we conclude that we may more suitably address the matter within the bankruptcy context, having obtained limited jurisdiction thereof by means of a selective withdrawal of reference. Mr. Benny, his attorneys in both the bankruptcy and the criminal action, counsel for the trustee and numerous counsel for various creditors were present at the hearing. They agreed that such selective withdrawal would facilitate a proper disposition of the redirection issue. Those present further agreed that the court would adjudicate the matter on the basis of the record previously established in the criminal proceeding. We now address more fully the matter of the mail redirection and the appropriate scope of relief therefore.

## II. DISCUSSION

### A. AUTHORITY FOR MAIL REDIRECTION

#### 1. The Trustee

■ The trustee in bankruptcy is appointed by the bankruptcy court, 11 U.S.C. § 701, or elected by the creditors of the bankrupt, 11 U.S.C. § 702.[12] The trustee is both an officer of the court and a representative of the bankrupt's creditors and has a duty to realize the maximum from the estate of the bankrupt for distribution to the creditors. *In re Luther,* 465 F.2d 19 (9th Cir.1972); *Commercial Credit Corp. v. Skutt,* 341 F.2d 177 (8th Cir.1965); *DePinto v. United States,* 407 F.Supp. 5 (D.Ariz. 1976), *aff'd on other grounds,* 585 F.2d 405 (9th Cir.1978).

■ The trustee is a creature of statute and has only those powers conferred thereby. *Cissell v. American Home Assur. Co.,*

521 F.2d 790 (6th Cir.1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 857, 47 L.Ed.2d 83 (1976). Pursuant to 11 U.S.C. § 704, the trustee shall:

1) collect and reduce to money the property of the estate for which the trustee serves, and close up such estate as expeditiously as is compatible with the best interests of parties in interest;

2) be accountable for all property received;

3) investigate the financial affairs of the debtor;

4) if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper;

5) if advisable, oppose the discharge of the debtor;

6) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;

7) if the business of the debtor is authorized to be operated, file with the court and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of said business, including a statement of receipts and disbursements, and such other information as the court requires; and

8) make a final report and file a final account of the administration of the estate with the court.

■ To facilitate the trustee's duty to collect and reduce to money the property of the estate, the trustee enjoys the following major powers and statutory aids:

the specification of assets of the estate in Section 541, the collection and avoiding powers in Sections 542–553, the aid of the automatic restraint under Section 362, the right to use, sell and lease property of the estate with the authorizations and limits of Section 363, the right to obtain credit under Section 364, to reject or

---

12. Commonly, the interim trustee continues to serve, and an election is never held. *See* 11 U.S.C. § 702(d).

adopt executory contracts under Section 365, the right to operate the business with court approval under Section 721, the right to avoid certain liens under Section 724(a) and dispose of property under Section 725.

D. Cowans, *Bankruptcy Law and Practice* § 2.7 at 27–28 (1983 Interim ed.). The trustee's expasive powers and duties appear to require, as a reasonable means to their effectuation, that the debtor relinquish possession and control of his business-related mail to the trustee. Indeed, the debtor is required to deliver to the trustee all property that the trustee may use, sell or lease under section 363. Section 542(a). Business-related mail, including checks, are assumedly a part of this property. Upon appointment of the trustee, title and right to the possession of the bankrupt's books and papers passes to the trustee. *In re Fuller,* 262 U.S. 91, 43 S.Ct. 496, 67 L.Ed. 881 (1923). Section 521 provides in part:

The debtor shall—

2) if a trustee is serving in the case, cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title;

3) if a trustee is serving in the case, surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate.

The knowing and fraudulent withholding of such property from the trustee constitutes a criminal offense under 18 U.S.C. § 152. Furthermore,

Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to disclose such recorded information to the trustee.

11 U.S.C. § 542(e).

However, a trustee's right to receive the mail does not necessarily include the right to *redirect* the bankrupt's mail—both business and personal, or either—without notice to the bankrupt and opportunity to object. Section 542(e), *supra,* appears to recognize that books, records and papers— including, assumedly, mail—may contain private or privileged matter whose disclosure should not be unnecessarily mandated and therefore provides for judicial oversight of the production. If the trustee were not able to redirect a bankrupt's mail by filing a change of address card, he would be forced to proceed under section 542(e) to obtain present and future control of that mail, and the bankrupt would be afforded both notice, hearing and judicial consideration of all applicable privileges. We should not lightly infer that a trustee may legitimately circumvent the salutary requirements of section 542(e) by an expedient which is nowhere explicitly authorized by law, particularly when such an inference runs counter to fundamental principles long cherished by the citizenry.

Despite the absence of authority for this practice, mail redirection has apparently become an accepted procedure under the Bankruptcy Act. No less a treatise than *Colliers on Bankruptcy* candidly asserts:

The receiver must at once secure the bankrupt's mail, either by directing the postal authorities to make delivery to the receiver himself or to a new post opened by the receiver. In a business which had accounts receivable, the mail usually contains checks from account debtors in payment of the account and, if the bankrupt is permitted to obtain such checks, the danger is great that they will be cashed and the proceeds spent. Although in theory it is possible to compel the bankrupt through a turnover order to surrender or pay over to the estate all moneys collected by him after the institution of the proceedings, at times it is extremely difficult to enforce such a turnover order. No doubt the bankrupt is compelled to account for all properties that he failed to surrender and all moneys that he received after the institution of the proceedings, but the inability to comply with the turnover order would be a complete defense to any contempt citation that might be

issued when he fails to obey the order of a court to turn over the money.

11A *Colliers on Bankruptcy* 187–88 (14th ed. 1978).[13] Thus, a longstanding pattern has placed a gloss on the language of the statute. However, an unlawful or unauthorized exercise of power does not become legitimated or authorized by reason of habitude. *See, e.g., Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). *Compare Brown v. Bd. of Educ.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), *with Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).

2. The Postal Service

In establishing the United States Postal Service, Congress articulated the basic operational policy thereof:

(a) The United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people. The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people. It shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities. . . .

(e) In determining all policies for postal services, the Postal Service shall give the highest consideration to the requirements for the most expeditious collection, transportation, and delivery of important letter mail.

39 U.S.C. § 101(a), (e). The Postal Service is specifically empowered to, *inter alia:* provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail.

11 U.S.C. § 404(a)(1). *See also* 11 U.S.C. § 403 (general duties). These provisions acknowledge the essential role occupied by the transmission of written communication in our vast and complex society.

The statutory scheme is conspicuously silent on the Postal Service's power to delay or refuse to deliver an addressee's mail, except under narrowly limited circumstances.[14] Indeed, mail tampering provisions explicitly prohibit obstruction of the mail generally, 18 U.S.C. § 1700,[15] obstruction of particular correspondence, 18 U.S.C. § 1701,[16] and delay or destruction of mail or newspapers, 18 U.S.C. § 1703.[17] We do not intend to suggest that, absent a criminal purpose, a trustee or a postal employee who

---

**13.** These comments would be equally applicable to a trustee under the 1978 Act.

**14.** *See* 39 U.S.C. § 3001 *et seq.* (nonmailable matter).

**15.** Section 1700 provides:

Whosoever, having taken charge of any mail, voluntarily quits or deserts the same before he has delivered it into the postal office at the termination of the route, or to some known mail carrier, messenger, agent, or other employee in the Postal Service authorized to receive the same, shall be fined not more than $500 or imprisoned not more than one year, or both.

**16.** Section 1701 provides:

Whoever knowingly and willfully obstructs or retards the passage of the mail, or any carrier or conveyance carrying the mail, shall be fined not more than $100 or imprisoned not more than six months, or both.

**17.** Section 1703 provides:

Whoever, being a Postal Service officer or employee, unlawfully secretes, destroys, delays, or opens any letter, postal card, package, bag, or mail entrusted to him or which shall come into his possession, and which was intended to be conveyed by mail, or carried or delivered by any carrier or other employee of the Postal Service, or forwarded through or delivered from any post office or station thereof, established by authority of the Postmaster General or the Postal Service, shall be fined not more than $500 or imprisoned not more than five years, or both.

Whoever, being a Postal Service officer or employee, improperly detains, delays, or destroys any newspaper, or permits any other person to open, any mail or package or newspapers not directed to the office where he is employed; or

Whoever, without authority, opens, or destroys any mail or package of newspapers not directed to him, shall be fined not more than $100 or imprisoned not more than one year, or both.

participates in the redirection of a bankrupt's mail would be criminally liable under the above statutes. However, such provisions do evidence an affirmative Congressional desire narrowly to restrict all interference with the free passage of mail, an intent which we consider in our endeavor to ascertain the limits of the Postal Service's authority in this matter.

At the March 15 hearing, Regional Solicitor Lyman Johnston candidly avowed that no statutory authority exists which permits the Postal Service to cooperate with a trustee's redirection request, nor has the Postal Service promulgated any specific regulations on the subject. Mr. Johnston proffered the only relevant authority on point— an opinion of the Solicitor for the Post Office Department, written more than thirty years ago. That opinion states *in toto:*

> This will reply to your letter of September 1, 1950 (INC GM:NB), with further reference to mail addressed to Abraham Gold, 648 Broadway, New York 12, N.Y., which is claimed by Abraham Kleinberg as trustee in bankruptcy of Abraham Gold, doing business as Golden Novelty Co.
>
> The mail in question may be forwarded to the trustee in bankruptcy if the bankrupt's home address is unknown or if, after notice of the proposed action, the bankrupt raises no objection. If Mr. Gold claims nonbusiness mail addressed to him at 648 Broadway, that mail should be treated in accordance with his directions. Under those circumstances, mail addressed "Abraham Gold, Golden Novelty Co., 648 Broadway," should be treated as business mail.
>
> In the case of the bankruptcy of an individual, mail addressed in the manner indicated may reasonably be claimed by a trustee, although in other situations the mail would be considered to be personal mail.

9 Op.Solic.P.O.Dep't. 243 (1952). The opinion cited no statutory or case authority in support of its conclusion.

Moreover, its arguable validity aside, that opinion would not validate the mail redirection at issue herein, which far exceeded the limits articulated by the Solicitor's opinion. The trustee's requests for change of address were not restricted to Mr. Benny's business address, nor to mail addressed to Mr. Benny "dba Diamond Heights Associates," or "Diamond Heights Village." The trustee did not provide notice to Mr. Benny before instituting the redirection; all nonbusiness mail addressed to any member of the Benny family at Redrock Way or Ralston Avenue was redirected along with the business mail; and finally, the trustee did not promptly deliver or forward all personal mail to the Bennys.

The Domestic Mail Manual of the Postal Service, which is incorporated by reference in the Postal Service regulations, 39 C.F.R. § 111.1 (1982), provides that:

> Unless otherwise directed, an addressee's mail may be delivered to his employer or to a competent member of his family. A person or a number of persons may designate another to receive their mail. Designation of another person to receive mail should be in writing, but no special form is furnished or required.

Section 153.211. It further provides that:

> Where persons make conflicting orders for delivery of the same mail, and they are unable to agree among themselves which party should receive the mail, the mail may be delivered to a named receiver or third party unanimously agreed to by the disputing parties.
>
> Where the disputing parties are unable to select a receiver, each party shall furnish the postmaster all available evidence on which he relies to exercises control over the disputed mail. If after receipt of such evidence the postmaster is still in doubt as to who should receive the mail, the postmaster will submit the case to his regional counsel for a ruling.
>
> Where the same mail is claimed by different persons, and a court decides to whom delivery should be made, the mail will be delivered in accordance with the court order.

Sections 153.71–73. Thus, section 153.211 clearly contemplates that the addressee

alone, or perhaps an agent who possesses the power of attorney (and submits evidence thereof with his request), may legitimately request a redirection of mail. Section 153.73 explicitly provides for the resolution, by a neutral decisionmaker, of disputes concerning the rightful possession of mail. Such a provision implies that the affected parties will each have notice of the situation and an opportunity to be heard.

■ On the basis of the foregoing analysis, and in light of the important values at stake, *see* discussion *infra,* we conclude that the trustee is not authorized to file, nor the Postal Service authorized to grant, a request for mail redirection under the present practice.

### B. PRIVACY

Innumerable businesses file or are subject to bankruptcy proceedings each year. Many of these businesses are sole proprietorships, such as Mr. Benny's. Such enterprises may be operated out of an individual's residence. Even when this is not the case, frequently business-related mail is sent to both the business and the personal addresses and, similarly, personal mail may be sent to both locations. Business mail may not always be directed to the business by name (or "dba") but may instead be sent to the owner(s). Thus, under the mail redirection practice at issue here, the trustee may indiscriminately intercept a bankrupt's personal mail in order to obtain possession of the business mail. The present change of address procedures are not sufficiently sensitive to reach one without including the other. To ascertain the nature of the documents thus collected, the trustee may scan or indeed read their content; no procedural safeguards prevent his doing so. An insensitive or unscrupulous trustee [18] may obtain much personal information in this manner and may disseminate this information to third parties. Indeed, the danger of improper or negligent disclosure becomes all the greater in light of the trustee's statutory obligation to furnish information "concerning the estate and the estate's administration" upon request of a party in interest. 11 U.S.C. § 704(6). Although under this section a court may order otherwise, this safeguard would only become meaningful in the present situation if a bankrupt is promptly made aware that personal or privileged information may likely or possibly be revealed. With such notice, he is free to invoke the court's consideration. No such notice is currently provided.

■ The present practice, then, threatens significant privacy interests as recognized under both state and federal law. In *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), the Supreme Court stated that the constitutional right of privacy includes the "interest in avoiding disclosure of personal matters." *Id.* at 599, 97 S.Ct. at 876. In *Whalen,* the Court upheld a New York statute which required the recording, in a central computer file, of the names and addresses of all persons who had obtained, pursuant to a doctor's prescription, certain drugs for which there existed both a lawful and unlawful market. However, the Court emphasized that the case did *not* involve "the unwarranted disclosure of accumulated private data—whether intentional or unintentional—or . . . a system which did not contain [adequate] . . . security provisions." *Id.* at 605, 97 S.Ct. at 879. Admittedly, the present practice does not involve "the accumulation of vast amounts of personal information in computerized data banks or other massive government files," *id.,* but it *does* involve widespread, pervasive intrusion into personal matters by individuals appointed by the bankruptcy court and empowered by the Bankruptcy Reform Act.[19] Such over-

---

18. We do not suggest that Mr. England is guilty of being either.

19. Unlike the public defender in *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), who is employed by the county to serve solely the interests of his client, the trustee is not the *personal* representative of the bankrupt, but instead seeks the best interests of the estate and its creditors. The trustee does not stand in an adversarial posture against the state and, indeed, is substantially under the control of the bankruptcy court. Hence, for purposes of our constitutional dis-

broad invasion of privacy cannot be justified by the need to obtain assets and business information which are transmitted through the mail.

Furthermore, the right of personal privacy is protected by both state common and constitutional law. Federal agents may not open, read and copy the personal mail of citizens without risking liability under the Federal Tort Claims Act for conduct which violates the right to be free from intrusion into one's private affairs. *See United States v. Birnbaum*, 588 F.2d 319 (2d Cir. 1978) (activities of CIA in opening, reading and photocopying letters which American citizens sent to, or received from, the Soviet Union, constitutes an actionable intrusion upon privacy under state law). *See also* 47 A.L.R.Fed. 285. California recognizes such a right. *See, e.g., Noble v. Sears, Roebuck & Co.*, 33 Cal.App.3d 654, 109 Cal.Rptr. 269 (1973) (shadowing); 4 B. Witkin, *Summary of California Law* § 336 at 2600 (1974). Moreover, California has recently enacted into its constitution a provision which specifically protects individual privacy. Cal. Const. Art. I, § 1.[20] The principal objective of this amendment was to provide a judicial remedy against 1) "government snooping" and the secret gathering of personal information; 2) the overbroad collection and retention of unnecessary personal information by government and business interests; 3) the improper use of information properly obtained for a specific purpose; 4) the lack of a reasonable check on the accuracy of existing records. *White v. Davis*, 13 Cal.3d 757, 775, 120 Cal.Rptr. 94, 533 P.2d 222 (1975).

Whether personal or confidential information is collected in vast computer banks or amassed by a single individual in an unauthorized manner, individual privacy is unquestionably threatened. The former, admittedly, poses a greater and more pervasive danger to society as a whole, but the latter is surely of significant consequence to the multitudinous persons and businesses who fall beneath the jurisdiction of the Bankruptcy Act.

Finally, the present practice is sufficiently casual and unregulated as to permit, if not encourage, trustees to intrude upon the privacy of confidential communications passing between attorney and client and protected by the attorney-client privilege, as recognized by state, Cal.Evid.Code § 954, and federal, Fed.R.Evid. § 501, law. The privilege is not a *mere* "rule of evidence," as counsel for the trustee suggests. The evidentiary rule reflects the recognition that the privacy of such communications is essential to promote full disclosure, mutual trust and free discussion. Violations of that privacy may be partially rectified by such evidentiary rules and, in the criminal arena, by reversal of conviction, both of which serve further to deter future intrusions. But the mere existence of these rules and the availability of subsequent relief do not justify the continuation of a practice which is readily susceptible to abuse of the privilege. In such a case, prophylactic measures are also appropriate to reduce such improper intrusions to the absolute minimum. This is particularly true where, as here, the person privy to the privileged correspondence stands in an adversary relation to the debtor/client.

## C. FIRST AMENDMENT

 The first amendment protects an individual's interest in receiving ideas and information through the mails. As Mr. Justice Holmes stated, dissenting in *Milwaukee Pub. Co. v. Burleson*, 255 U.S. 407, 437, 41 S.Ct. 352, 363, 65 L.Ed. 704 (1921):

> The United States may give up the Post Office when it sees fit, but while it carries it on the use of the mail is almost as much a part of free speech as the right to use our tongues.

---

cussion, the action of the trustee may be said to be sufficiently entwined with that of the government to justify a finding of "state action." Certainly, the acts of the Postal Service may be considered such.

20. All people are by nature free and independent, and have certain inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

The federal government may not place unnecessary burdens on the addressee's ability to receive personal mail, such as requiring the addressee affirmatively to request the delivery of specific matter once such matter has been received by the Post Office in his name. *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). *Lamont* recognized that the requirement that a recipient affirmatively request specific pieces or categories of mail may deter one who wishes to receive information of a politically or personally sensitive nature. Communication may similarly be deterred when an addressee facing bankruptcy, or his addressor, realizes that the mail may be received and read by a non-neutral third party.

■■■ The unfettered use of the mails facilitates the "uninhibited, robust and wide-open" debate and discussion which is an essential part of our system of free communication and democratic participation. *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). Both the sender and the recipient have a constitutionally-protected interest in the communication which passes between them. Ideas and information ranging from the political to the most personal are conveyed thereby. Often the timeliness of such transmission is of crucial importance, affecting decisions and actions imminently to be undertaken. Substantial, and, particularly, unannounced, interference with the mails may significantly impede or frustrate personal decisions of no little magnitude, causing confusion and possibly irreparable harm to various relationships and opportunities. Thus, the first amendment interests of both addressee, *Lamont, supra,* and sender, *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), are jeopardized by the present practice of mail redirection.

■■■ An individual facing bankruptcy must cooperate with the statutory scheme, to be sure. But he does not thereby automatically suffer a loss of important civil rights. Indeed, prisoners, whose incarceration suspends their enjoyment of many civil liberties, retain

those first amendment rights not inconsistent with their status as prisoners or with penological objectives of the corrections system.... [C]hallenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system.

*Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Despite the judiciary's abiding reluctance to interfere with prison administration, courts have refused to validate overly broad restrictions on, or censorship of, communication between inmates and the outside world. *See Storseth v. Spellman,* 654 F.2d 1349 (9th Cir.1981); *Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Guajardo v. Estelle,* 580 F.2d 748 (5th Cir.1978); *Morgan v. LaVallee,* 526 F.2d 221 (2d Cir. 1975); *Minnesota Civil Liberties U. v. Schoen,* 448 F.Supp. 960 (D.Minn.1977).

Similarly, we acknowledge that administration of the bankruptcy system is quite complex and that a trustee may be responsible for dozens of cases simultaneously; we do not seek unduly to interfere. We note further that mail redirection does not pose the issue of ideological suppression or censorship so often present in the prisoner cases. However, the demands of efficiency and enforcement of the bankruptcy laws do not necessarily outweigh interests in privacy and free expression.

■■■ Practices which do not involve content regulation but which impact adversely upon communicative freedoms must satisfy the test articulated in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The *O'Brien* test applies when a court must deal with the problem of incidental restrictions upon communicative liberties imposed in furtherance of legitimate governmental activities, such as the proper administration of the bankruptcy system. Thus, a practice is valid if it furthers an important or substantial governmental interest unrelated to the suppression of free expression, and if the re-

striction upon first amendment freedoms is no greater than is essential to the furtherance of that interest. *Id.* at 377, 88 S.Ct. at 1679. In this case, the addressee's right to receive information, *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), and his free association-al rights, *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), may be adversely affected by mail redirection; hence, the *O'Brien* test appears to be relevant to this analysis. The first of the *O'Brien* criteria may be satisfied here; however, the complete redirection of a bankrupt's personal and business mail, from both his residence and business addresses, without notice and hearing, is surely broader than necessary to effectuate the trustee's valid interest in collecting and reducing to cash the property of the estate or in running the bankrupt's business.

## D. FOURTH AMENDMENT

 The fourth amendment, although not clearly applicable to such a situation, also informs our evaluation of the validity of present mail redirection procedures. That amendment protects, from unjustifiable governmental intervention, a defendant's reasonable expectation of privacy in his person, his home and office, and his papers and effects. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Any intrusion upon such a reasonable expectation of privacy constitutes a "search" within the meaning of the fourth amendment. *Id.* at 353, 88 S.Ct. at 512. Although the amendment is generally invoked in the context of a criminal prosecution, it may apply when administrative or law enforcement officials intrude upon an individual's privacy, even though they do not suspect the individual of criminal activity. *See Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930

(1967); *See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). *See also Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). Moreover, where the materials seized or intercepted may be protected by the first amendment, the requirements of the fourth amendment must be applied "with scrupulous exactitude." *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

 The free passage of sealed mail is protected by the fourth amendment from governmental interception and intrusion. As the Court stated in *Ex parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1877):

Letters and sealed packages ... in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be. Whilst in the mail, they can only be opened and examined under like warrant, issued upon similar oath or affirmation, particularly describing the thing to be seized, as is required when papers are subjected to search in one's own household. No law of Congress can place in the hands of officials connected with the postal service any authority to invade the secrecy of letters and such sealed packages in the mail; and all regulations adopted as to mail matter of this kind must be in subordination to the great principle embodied in the fourth amendment of the Constitution.

*Cf. United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).

 Hence, the imposition of mail covers [21] is subject to fourth amendment

---

**21.** 39 C.F.R. § 233.2(v)(1) provides:

"Mail cover" is the process by which a record is made of any data appearing on the outside cover of any class of mail matter, including checking the contents of any second-, third-, or fourth-class mail matter as

now sanctioned by law, in order to obtain information in the interest of (i) protecting the national security, (ii) locating a fugitive, or (iii) obtaining evidence of commission or attempted commission of a crime.

scrutiny. *See generally* Note, "Mail Covers and the Fourth Amendment," 12 *Loyola L.A.L.Rev.* 210 (1978) and cases discussed therein; 57 *A.L.R.Fed.* 742. In *United States v. Choate,* 576 F.2d 165 (9th Cir. 1978), *cert. denied,* 439 U.S. 953, 99 S.Ct. 350, 58 L.Ed.2d 344 (1978), the Ninth Circuit upheld such a surveillance technique on the basis that neither the addressee nor sender retains a reasonable expectation of privacy in the exterior of an envelope, which is intended to be viewed by postal service employees, and that the minimal delay resulting from a mail cover does not violate statutes forbidding interference with the mails, 18 U.S.C. §§ 1701–03. However, the court emphasized that "the contents of the letters are not disclosed," *id.* at 176 n. 10, and noted that *Ex parte Jackson, supra,* had prohibited the warrantless opening and examination of sealed letters and packages, *id.* at 177. Mail covers, then, are only permissible because they are limited to the recordation of information on the outer envelope, do not significantly delay mail transmission and can be requested only by an established federal agency under specified circumstances.

▮ The mail redirection at issue herein is quite distinguishable. To be sure, the trustee does not deliberately seek information to be used in a criminal prosecution or for purposes of political surveillance. However, when bankruptcy and criminal proceedings are so intricately interwoven, as they are in this case and may be in many others, and when the trustee by statute must communicate regularly with creditors who may have a particular interest in assisting the criminal prosecution, fourth amendment principles cannot be viewed as irrelevant. At the very least, the redirection must be reasonable in breadth, and it must afford the bankrupt adequate procedural protections. The present practice satisfies neither.

The Postal Service must receive a written request to impose a mail cover from a law enforcement agency stipulating that reasonable grounds exist to believe that the mail cover is

## E. SIXTH AMENDMENT

▮ In *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Supreme Court stated that a defendant is constitutionally entitled to the assistance of counsel "during perhaps the most critical period of the proceedings . . . that is to say, from the time of [his] arraignment until the beginning of [his] trial, when consultation, thoroughgoing investigation and preparation [are] vitally important." *Id.* at 57, 53 S.Ct. at 59. The sixth amendment right to counsel attaches no later than the filing of the indictment; thereafter, the constitution prohibits the state from erecting a structural or procedural impediment that prevents the accused from receiving the benefits of the sixth amendment guarantee. The state cannot create procedures which prevent an accused's counsel from fulling assisting and representing him. *See United States v. Decoster,* 624 F.2d 196 (D.C.Cir.1979). The government may not intentionally create a situation "likely to induce [an accused] to make incriminating statements without the assistance of counsel." *United States v. Henry,* 447 U.S. 264, 274, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115 (1980). *See also Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Nor may the government covertly intercept or overhear conversations between an accused and his counsel. *Black v. United States,* 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966); *O'Brien v. United States,* 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967); *United States v. Levy,* 577 F.2d 200 (3d Cir.1978); *Caldwell v. United States,* 205 F.2d 879 (D.C.Cir.1953), *cert. denied,* 349 U.S. 930, 75 S.Ct. 773, 99 L.Ed. 1260 (1955).

There is no evidence in this case that the government, either intentionally or unintentionally, has obtained information relevant to the criminal proceedings which was contained in privileged communications. However, such unregulated mail redirection may raise questions and doubts in the minds of the defendant and the public concerning

necessary to serve the above interests. 39 C.F.R. § 233.2(d). *See also* 39 C.F.R. § 233.-2(c)(4) (definition of law enforcement agency).

such possible governmental access and casts a shadow over future proceedings. Moreover, from the perspective of our supervisorial authority over the bankruptcy court, we are concerned that abuses could in fact occur in future bankruptcy/criminal proceedings. Both the appearance and the existence of propriety are essential in matters which seriously affect an individual's liberty.

■ Furthermore, the delay and confusion occasioned by the mail redirection practice may actually interfere—and in this case, did interfere—with a defendant's right to confer with counsel in order to prepare a defense. As Mr. Benny declared, he did not receive numerous letters from his counsel in the criminal action. Neither he nor his counsel had reason to suspect that the mail redirection was occurring; hence, the apparent absence of written communication from counsel and of response from the Mr. Benny resulted in a mutual disaffection and distrust, as well as a loss of valuable trial preparation time. Attorney-client correspondence must be treated with special solicitude at all times, in order to preserve the defendant's right to prepare a defense, just as it is protected in the prison context in order to preserve an inmate's right to access to the courts. *Guajardo v. Estelle, supra,* at 757–59 (incoming mail from attorney could be opened only to inspect for contraband and in presence of inmate); *Taylor v. Sterrett,* 532 F.2d 462 (5th Cir.1976) (same); 5 A.L.R.3d 1360.

## III. SCOPE OF RELIEF

As the foregoing demonstrates, the present practice of mail redirection encroaches upon fundamental rights and liberties. We cannot permit such restriction of these liberties to continue without the debtor's being afforded the basic procedural protections mandated by the due process clause of the fifth amendment. *Procunier v. Martinez, supra,* 416 U.S. at 418, 94 S.Ct. at 1814; *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In *Procunier v. Martinez,* the Court required that a prisoner

be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence.

*Id.* 416 U.S. at 418–19, 94 S.Ct. at 1814.

■ We conclude that the imposition of similar procedural safeguards would be appropriate in the instant situation. Most importantly, the trustee must *notify* the debtor before commencing a mail redirection in the future. The absence of notice has served as the major source of prejudice in the criminal proceeding involving Mr. Benny; such lack of notice shall not reoccur in the future.

At present, the trustee is free to redirect Mr. Benny's business mail from 115 Red Rock Way, although he must refrain from redirecting mail addressed thereto in the names of Mary Ann Benny and George I. Benny, Jr. By our order of March 24, we required the trustee to notify the Postal Service to cease from redirecting Mr. Benny's mail from all other locations. We required Mr. Benny to request his attorneys to address their correspondence with him to a location other than Red Rock. We further required Mr. Benny to return to the trustee all business mail not protected by the attorney-client privilege. Although we did not so specify in our previous ruling, we now order the trustee promptly to deliver or forward to Mr. Benny any nonbusiness mail which he receives from the Red Rock redirection. We understand that the trustee is currently making all mail available to Mr. Benny's counsel in the criminal action, who returns the business mail to the trustee, an arrangement apparently reasonably satisfactory to all parties.

■ In the future, should the trustee, or any of his successors, determine that he must again gain control of the mail addressed to locations other than Red Rock in order to be able to fulfil his duties, he shall provide notice to Mr. Benny that he intends

to implement such redirection. If Mr. Benny objects to said redirection, he shall, within five (5) business days from the receipt of said notice, present his objections to the court. Having withdrawn the reference to the bankruptcy court on the redirection issue, this court will entertain any such objections. In cases involving other debtors, we strongly urge the bankruptcy court similarly to require a trustee to provide notice and an opportunity for the debtor to ventilate his objections and to seek a protective order limiting the scope of the redirection.

 If the debtor raises no objections, the trustee must submit to the Postal Service, along with his change of address request, evidence both of his authority to redirect, *e.g.*, the court order approving his bond, and of notice having been sent to the debtor. He must deliver or forward all nonbusiness mail to the bankrupt *promptly*. In the case at bar, we are shocked that the trustee, who assumedly was aware of the pending criminal prosecution against Mr. Benny and who might have anticipated that important correspondence might be contained in the redirected mail, still did not expeditiously return the nonbusiness mail to Mr. Benny. Furthermore, the trustee shall refrain from opening the nonbusiness mail whenever he can practicably identify it as such by examining the information on the envelope. If the trustee must open the mail in order to ascertain its nature, he shall retain the envelopes and attach them thereto. He shall keep a log of all mail received, both business and personal, entering therein the name and address of the sender, the postmark date and, in the case of business mail which is opened and read, the nature of the communication.

If the debtor does object to a future redirection, or if the present arrangement proves unsatisfactory to the debtor or the trustee, and they cannot agree upon an alternate solution, either may request this court [22] to appoint a neutral administrator or master to review the mail and to separate the personal from the business correspondence. The appointment of a neutral

third party who separates privileged or personal documents from the non-personal has been utilized and approved in a variety of contexts. *See, e.g., Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (screening of presidential papers by Executive Branch archivists); Cal.Penal Code § 1524(c)–(f) (state bar appointed attorneys serve as special masters to conduct the office searches of disinterested professionals). Indeed, courts may appoint special masters pursuant to Rule 53, F.R.Civ.P., to examine documents *in camera* and report to the court on the merits of a claim of privilege. *See, e.g., Collins and Aikman Corp. v. J.P. Stevens & Co.*, 51 F.R.D. 219 (D.S.C.1971). In this context, such a master need not be an attorney. The trustee and the debtor may each submit a list of suitable individuals to the court or may agree upon a particular person; the ultimate decision whether, and whom, to appoint lies within the informed discretion of the court. The expense of such a master shall be borne by the debtor's estate. If, having considered the debtor's objections, the court declines to appoint a master, the court shall render an order permitting the trustee to redirect the mail under specified conditions appropriate to the particular case and enjoining the debtor from interfering with said order, *i.e.*, from deliberately diverting business mail from the trustee's control.

IT IS THEREFORE ORDERED that the Motion to Withdraw the reference to the bankruptcy court is hereby DENIED IN PART and GRANTED IN PART, *i.e.*, granted solely on the issue of mail redirection.

IT IS FURTHER ORDERED that the trustee and the debtor shall abide by the procedures concerning relief hereinbefore detailed.

**22.** Again, in other cases this motion would be made before the bankruptcy court.