BAILEY ALDRICH, Senior Circuit Judge.
This is an action by plaintiff Dennis G. Bezanson, trustee in bankruptcy (Chapter 7) of Medomak Canning Co., Inc., on a policy of insurance issued by defendant Metropolitan Insurance and Annuity Co. on the life of Medomak’s late president, Bernard J. Lewis. Medomak is the named owner and beneficiary. Lewis died on May 27, 1989. Possibly because of the amount involved ($500,000), with some substantial questions both sides include a number of contentions that can only be thought of as far out. First the facts.
No semi-annual premium had been paid since plaintiff had been appointed Medo-mak’s trustee in April, 1986. However, under the policy terms an interest-bearing “accumulated fund,” or “surrender value,” would maintain the policy by a fractional premium deduction on the fifth of each *3 month until the fund was exhausted. Because the interest earned by the fund was variable, the exact exhaustion date could not be predicted in advance. Consequently the policy provided that when exhaustion did occur the policyowner was to be given notice of lapse, and 61 days grace to make a payment, during which time the policy would continue in force automatically. The policy lapsed for an insufficient fund on November 5, 1988. Defendant sent the 61 day notice to Medomak’s Post Office box named in the policy, and not to plaintiff trustee — who failed to visit the box and therefore did not receive it. Plaintiff did not pay the premium, and, by its terms, the policy finally terminated on January 5, 1989.
After Lewis died on May 27, 1989 defendant rejected plaintiffs claim for the policy proceeds and plaintiff brought suit. The court held that to mail the lapse notice to the Medomak box, addressed to Lewis, rather than to Medomak Canning Corp., was proper, but that the notice, or a copy, should have been sent to plaintiff at his office address. In default of this it held the time to pay the premium was extended indefinitely, and entered judgment for plaintiff. Defendant appeals. We reverse.
Before the three principal questions, we consider lesser ones that are readily disposable. Those raised by defendant are,
a) That plaintiff lacks standing to sue. On a mishmash of arguments, apparently based on the fact that plaintiff had attempted to surrender the policy, and that at one time it had been assigned as security for a loan, and with appeals to equity, defendant would overlook the fact that plaintiff, as trustee, had title to the policy. In re O’Neill Enterprises, 547 F.2d 812, 815 (4th Cir.1977); In re Cooperativa Cafeteros De Puerto Rico, 37 B.R. 952, 955 (D.P.R.1984). Defendant exhibits no embarrassment that it offers no suggestion as to who has standing to sue if plaintiff does not.
b) That there are no consequences of failing to give a notice of lapse. Concededly, the policy states no consequences. What they may be is a question we will come to, but we are surprised that Home Office counsel would argue there are none, leaving defendant’s promise a meaningless gratuity, indeed, as so interpreted, a misleading one.
c) That an owner has a burden of showing he would have paid the premium had he received the notice. This, too, cannot be true as a general proposition. Whether there may be special considerations here, we will come to.
Defendant is not alone in reaching for straws. According to plaintiff,
d) Defendant sent the lapse notice to the wrong address in order to avoid a continuance of the policy. Insurance companies exist on policies, not lapses. Plaintiff points to the fact that defendant knew Lewis had a form of cancer, apparently arrested. However, defendant knew this when it wrote the policy. Plaintiff was closer to Lewis than was defendant, and, rather than seek to continue, he was trying to surrender it. Indeed, if defendant was apprehensive about his health, Lewis, to whom the notice was addressed, would be the one best aware if it was failing.
e) From as early as September, 1987 defendant “began treating Bezanson as the Policyowner.” Clearly it did the opposite. Rather than recognize plaintiff as owner, when he sought to surrender the policy defendant refused, sending him a form that showed the owner to be Medomak Canning Company, P.O. Box 4566, Portland, Maine 04112, with a letter stating that “it must be signed by the owner of the policy.” An attorney who had been a bankruptcy trustee “several thousand” (sic) times should have realized that defendant was not regarding him as the owner. This indication was given, see post, three times.
f) It was insufficient to address the lapse notice to Lewis, rather than to Medomak Canning Corp. Plaintiff’s criticizing the court’s finding seems particularly ingenuous since he did not go to the Medomak box, or take steps relating to any mail addressed thereto, and, therefore, would not have received mail, however addressed, *4 unless through the courtesy of Lewis, who retained access.[1]
To turn to the facts in more detail, on October 7, 1987, on his personal letterhead as Attorney at Law, plaintiff wrote defendant’s local sales representative, Cummings, enclosing a certificate of his appointment as acting Trustee of Medomak’s bankruptcy estate and requesting information about the policy “owned by the above-referenced Debtor.” Unmindful that Cummings, as a layman, might not read this to say the title to the policy was now in plaintiff, as distinguished from the “above-referenced Debtor,” plaintiff did nothing to elucidate. Not surprisingly, when Cummings obtained an information sheet from the Home Office (headed with Medomak’s P.O. Box 4566) he sent it to plaintiff, at plaintiff’s address, with “the necessary papers in regards to assignment,” a clear indication, as we have said, of a belief that, until assigned, plaintiff was not the owner. Cummings’ letter stated that the accumulated fund would probably become insufficient by November, 1988, though possibly as early as July; the exact date to depend on the variable interest factor. This was confirmed by a formal, more detailed sheet, sent by defendant in January, 1988. Following receipt, on January 25, 1988 plaintiff sent Cummings, on a company form, a request for the surrender value, together with another certificate of his appointment, with a request that the check be made payable to him. This resulted in two letters from defendant’s Home Office. The first requested further identification of the policy, and the second, under date of March 3, recited that the policy had been identified, and that the surrender request required “written consent from the Medomak Canning and the Canal Bank and Trust Company or an appropriate Court order.” Plaintiff made no reply. On his deposition he was asked,
Q. What steps, if any, did you take in response to that?
A. Well, first, my response was I couldn’t understand why they wouldn’t just surrender the cash value, and second of all, upon reading that they required the written consent of Medomak Canning, they already had that.... I am Medomak Canning. The trustee is Medo-mak Canning as a matter of law, and I signed the surrender in exactly that form.
Q. Did you ever write Metropolitan saying — giving your position on why the things they were asking were not necessary?
A. No, I didn’t.
Q. Did you ever seek any sort of a written consent from Key Bank [successor to Canal Bank] with respect to the release of any rights under the collateral assignment?
A. No, because I didn’t deem it was necessary.
On May 31 the Home Office wrote again, saying it had no reply to its March 3 letter, and that it was awaiting “the necessary information.” On June 10, 1988 plaintiff wrote the Home Office to the effect that if his demand of January 25 for the surrender value was not complied with he would institute suit on behalf of the bankruptcy estate. To this, on July 18, the Home Office repeated its request for written consents, and the matter lay there.
To return to plaintiff’s deposition,
Q. Why was it easier to bring suit against them instead of just getting signatures from Medomak and Key?
A. If you have been a trustee for any period of time, one of the largest aggravations in your life is insurance companies, okay. They make the process, which should be very simple, very difficult. And I have had a lot of experience with insurance companies on this type of *5 issue, among others, including coverage of bankruptcy, et cetera.
To go back a bit,
Q. You have to balance your priorities and decide who gets your attention?
A. What gets the most attention, sure, and a four thousand dollar claim versus other work that I had at that time was not high on this list of priorities.
Perhaps because he was thinking only in terms of the surrender check, for which he had given his address, plaintiff did not bother to fill out the part of the form providing space under REQUEST FOR CHANGE OF ADDRESS. At trial he testified he thought defendant would assume it from the fact he gave his address at the beginning of the form. Having in mind that defendant was a company doubtless doing business by computers with minimum hand work, it does not seem too much, when a party is given a form with a special place for requesting a change of address, to expect him to comply. However that may be, under no circumstances can we understand how plaintiff could sign his name directly under the printed statement that the policy was not assigned, and maintain thereafter the lack of need to obtain a release. The policy provided,
Collateral Assignment — Your policy may be assigned as collateral. All rights under the policy will be transferred to the extent of the assignee’s interest.
Assignments for security manifestly are not freely revocable.[2] Defendant could not deal with a person who, however titled, peremptorily claimed full rights, to the exclusion of the assignee-creditor. In the absence of fraud a trustee in bankruptcy has no more powers than the debtor. M. Rhodes, Couch on Insurance 2nd, § 63A:80 (rev. ed. 1983).
Actually, plaintiff settled with the assignee bank on March 7, 1988. He did not, however, bother to inform defendant even unofficially, let alone officially. Even if we overlooked what cannot be overlooked, that the release came long after January 25, 1988, there can be no merit in plaintiff’s contention that he need not supply an assignee release because Cummings knew the assignee’s counsel, who, presumably, had informed him of the discharge. No competent attorney should be “aggravated” by, or too busy to comply with, the wish of an insurer with a $500,000 policy, to have an executed release for its records, not simply a hearsay report.
Even if the reason suggested in note 1, ante is insufficient, we do not believe that plaintiff, who had never withdrawn his promise to sue for the surrender value of the policy, was legally entitled to a notice, or a copy of a notice, of lapse for nonpayment of premium being sent to an address other than the address of record on the policy. So far as defendant was concerned, plaintiff was through with the policy — it would be difficult to think of a clearer announcement. Since defendant did not recognize the surrender demand, concededly it was not excused from sending the lapse notice to the policyowner’s address of record, but it should not lie in plaintiff’s mouth to say it should do further.
If we are unduly hard on plaintiff here, defendant argued that even assuming the absence of proper notice, plaintiff was seeking an unreasonable extension of time in which to pay the premium. In rejecting this, the court said,
Metropolitan argues that this result will have the effect of extending coverage on life insurance policies indefinitely. But insurers are free either to send out the required notice or to change the terms of their contract (if permitted by state law).
The state law to which the court referred are statutes relating to casualty, property, and accident and health insurance (24-A Me. RSA § 2739, 2908 and 3050), and accident and health court decisions, e.g., Clark v. Insurance Co. of North America, 89 Me. 26, 35 A. 1008 (1896). The reference is inapposite. Such policies normally call for automatic renewal, but with the insurer *6 free to cancel if it gives advance notice. The court said that Maine does not have a lapse statute covering life insurance, but that it saw "no reason to distinguish life from casualty insurance for these purposes." This was not only to disregard the important distinction that ordinary life insurance policies are never cancelable by the insurer if the owner tenders the premium, but failed to note that Maine does have a statute for life insurance. 24-A Me. RSA § 2505, requires life policies to provide for 30 days grace after lapsing for nonpayment of premium, but, interestingly enough, requires no notice. We observe, incidentally, that § 2739 offers health insurers the right to terminate after nonpayment of the premium for three months, without notice, or in one month with notice. Plainly, Maine takes many views regarding nonpayment of premium. We think we should look to common law principles and not seek to draw analogies from statutes.
Apart from its construction and application of Maine statutes not apposite to this policy, the court cites nothing, and we are aware of no law anywhere supporting the position that failure to send a required notice of lapse will extend the coverage of any policy indefinitely. It would be a harsh, and most unreasonable rule. A grace period, continuing the coverage free, here 61 days, results in a selection against the company that it has accepted. The policy owner can wait, without obligation, and decide, retroactively, during that period, to, or not to, continue the insurance, depending on what develops. It is appropriate that there should be a further, penalty period for failure to give the owner the promised alert, but surely it would be extraordinary to say that he gets a free ride and retroactive choice forever; there must be a limit of reasonableness. Cf. Maine Mutual Fire Ins. Co. v. Watson, 532 A.2d 686, 689 (Me.1987) ("[W]hen no time for performance is specified in the contract, a `reasonable time' is implied."). Under the court's rule forgetful, or dishonest, policyholders, long after lapse could claim, if a loss occurs, that they never received the notice even though they had. This could create a jury issue, with unlimited selection against the company. At a minimum a company could never know what reserves to set up against apparently lapsed policies.
Because of its ruling that there was no limit, the district court did not consider whether the actual period it allowed was within reason. Lewis died on May 27, 1989. May 5 would have been three times the 61 days grace period for the November payment that had been indicated to plaintiff as probable. Watson held that, where the facts are stipulated, what is a reasonable time is a question of law. But, in any event, what is the maximum reasonable must be such a question. We consider three times the original grace period should give an owner with a bona fide intent to continue his policy sufficient time.
Plaintiff, moreover, was not even a bona fide forgetter. Asked on his deposition what his plans had been with respect to his promised suit for the surrender value, his response was, in substance, when he got the time. Thinking better, he amended this by adding,
I don't think I made any other decisions after June 10th, 1988, other than at some point I would be bringing suit against them, unless some other facts came to my attention that indicated to me that there should be another decision made.
(Emphasis supplied.) Quite clearly these facts were Lewis's health. Opportunism is unquestionably good business, but this is surely impermissible. In his affidavit plaintiff stated, "I depended on receipt of that [lapse] notice to trigger me to once again review Bernard J. Lewis' physical condition and to review, and depending on Mr. Lewis' condition, change my earlier decision to pursue the Policy cash surrender value." Obviously this meant the value as of January 1988, the date of the demand-when the policy lapsed it would have no value. Thus plaintiff was reserving to himself the right to choose freely, up to January 5, 1989, whether to receive the January 1988 accumulated value in cash, or to charge defendant with applying it to continue the policy for the year. This free *7 dom was independent of any subsequent default, if there were such, respecting a lapse notice. On what proper basis could plaintiff have such a right? Yet it is to this heads-I-win, tails-you-lose, that the court added indefinite continuance.
Because we cannot agree with this we deal only briefly with the complicated principles of a bankruptcy trustee’s duty regarding executory contracts. In Counties Contracting & Construction Company. v. Constitution Life Ins. Co., 855 F.2d 1054 (3d Cir.1988), the bankruptcy trustee did not pay the premium during the grace period as extended by the Bankruptcy Act. In rejecting a rule that would “retain indefinitely the option to make a retroactive decision to carry insurance,” the court held that if the trustee wanted to adopt the policy, he should obtain an order of authorization from the court. 855 F.2d at 1060. This was a reference to 11 U.S.C. § 365(d)(1), that provides that if the trustee does not apply within 60 days after the order for relief, an executory contract is “deemed rejected.” In the case at bar plaintiff did nothing within 60 days. It is not too clear, however, as to what is an executory contract from the bankruptcy standpoint. In L. King, 2 Collier’s on Bankruptcy ¶ 365.01 it is said, “The term ‘executory’ as applied to a contract is equivocal and quite possibly in the bankruptcy context has a rather more limited meaning than under state law.” At the same time, “performance to some extent [must] remain due on both sides.” Accord: In re Cochise College Park, 703 F.2d 1339, 1348 (9th Cir.1983); In re A.H. Robins Co., Inc., 68 B.R. 705, 707 (Bankr.E.D.Va.1986). This duality is what has produced the rule. The trustee may have an obligation to perform which he views as more burdensome to the estate than the revocation of the contract. If so, he may reject. Gloria Manufacturing Corp. v. I.L.G.W.U., 734 F.2d 1020, 1022 (4th Cir.1984). The other party, however, needs prompt information of the trustee’s decision. This second interest was well put in the report of the Senate Judiciary Committee. “This [60 day] provision will prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate.” S.Rep. No. 989, 95th Cong, at 59 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5845. Besides his business concerns, the creditor needs a rejection in order to file a timely claim against the bankrupt estate. In re Jolly, 574 F.2d 349, 351 (6th Cir.1978), cert. denied sub nom., Still v. Chattanooga Memorial Park, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978).
While plaintiff cites a number of bankruptcy court decisions involving casualty and property insurance stating that insurance is an executory contract in that there are obligations on both sides, In re Gamma Fishing Co., 70 B.R. 949, 951 (Bankr.S.D.Calif.1987); In the Matter of Pester Refining Co., 58 B.R. 189, 191 (Bankr.S.D.Iowa 1985); In the Matter of B. Siegel Co., 51 B.R. 159, 161 (Bankr.E.D.Mich.1985), insurance, perhaps particularly life insurance, where the insurer cannot refuse to renew, does not fit the conventional pattern. The policy owner, bankrupt or otherwise, has no obligation to pay premiums; he can stop at any time. He needs no court order. Correspondingly, the life insurer will never have a claim to file against the bankrupt, or concern as to the future. If the premium is paid when due, it will continue the policy; if it is not, it does not. Unlike a landlord, for example, advance notice of the policy owner’s intentions is of no moment.
We need not pursue the legalities of executory contracts, however. In this case plaintiff clearly, even though defectively, attempted to reject the contract by demanding its surrender value. Defendant was continually willing to make payment, and the only reason plaintiff did not receive it was due to his own, persistent, incompetence, or, perhaps his desire to play it both ways. We will not enforce that desire, or the irony of his incompetence entitling him to a recovery that is not merely a windfall, but a quite unreasonable result.
Reversed. Judgment to be entered for defendant.

. In a well-considered opinion in In re Benny, 29 B.R. 754, 760-762 (N.D.Cal.1983), the court held the trustee had a duty to obtain the bankrupt's mail. This would seem an expected duty of every trustee. A. Herzog & L. King, Collier Bankruptcy Practice Guide, ¶ 86.07[1] (1991). It might be a short answer to this case, though one that we need not make, that where plaintiff had made no formal request for a change of address on the policy records, it was legally proper, and sufficient, to mail as it did.

. This one provided to the assignee, "The sole right to surrender the Policy and receive the surrender thereof at any time provided by the terms of Policy and at such other times as the Insurer may allow.”